UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BEVERLY WAGNER                          CIVIL ACTION

VERSUS                                  NUMBER: 08-5219

MICHAEL J. ASTRUE,                      SECTION: "N"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


**REPORT AND RECOMMENDATION**


        Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this
matter comes before the Court on the parties' cross-motions for
summary judgment following a decision of the Commissioner of the
Social Security Administration denying plaintiff's application for
Disability Insurance Benefits ("DIB").  (Rec. docs. 9, 10).

        Beverly    Wagner,   plaintiff    herein,   filed   the   subject
application for DIB on June 20, 2006, alleging disability as of May
3, 2006. (Tr. pp. 59-63).  In a Disability Report that appears in
the record, the conditions resulting in plaintiff's inability to
work were identified as bilateral carpal tunnel syndrome ("CTS"),

back problems, arthritis in both legs, high blood pressure, and chest pain. (Tr. pp. 70-79). Plaintiff's application for DIB was denied at the initial step of the Commissioner's administrative review process on August 18, 2006. (Tr. pp. 36-39). Pursuant to plaintiff's request, a hearing <u>de novo</u> before an Administrative Law Judge ("ALJ") went forward on April 18, 2007 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 40-42, 18-34). On May 22, 2007, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 8-17). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 4-7). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1.  [t]he ALJ erred when he failed to find that claimant's degenerative disc disease in her cervical and lumbar spine was a "severe" impairment.

2.  [t]he ALJ failed to apply the proper legal standard to determine the credibility of plaintiff.

3.  [t]he substantial evidence in the case record establishes that plaintiff is not capable of performing work at the

light to sedentary exertional level and, therefore, the ALJ erred when he determined plaintiff's residual functional capacity.

4.     [t]he ALJ erred when he employed a hypothetical question during the testimony of the Vocational Expert ("VE"), Nancy T. Favaloro, that is not supported by the substantial evidence in the case record.

(Rec. doc. 9-3, pp. 6-7).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.     [t]he claimant meets the insured status requirements of the Social Security Act though December 31, 2010.

2.     [t]he claimant has not engaged in substantial gainful activity since May 3, 2006, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*).

3.     [t]he claimant has the following severe impairments: carpal tunnel syndrome and hypertension, and arthritis (20 CFR 404.1520(c)). <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985).

4.     [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light to sedentary work.

6.     [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     [t]he claimant was born on February 17, 1952 and was 54 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.     [t]he claimant has a 10th grade education and is able to

communicate in English (20 CFR 404.1564).

9.    [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR part 404, Subpart P, Appendix 2).

10.   [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.   [t]he claimant has not been under a disability, as defined in the Social Security Act, from May 3, 2006 through the date of this decision (20 CFR 404.1520(g)).

(Tr. pp. 13-17).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.

Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.   an individual who does not have a "severe impairment" will not be found to be disabled.

3.   an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.   if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5.   if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)).   Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362,

1364 (5th Cir. 1988); <u>Fraga</u>, 810 F.2d at 1302.

At the time of the administrative hearing that was held on April 18, 2007, plaintiff was fifty years of age, had completed ten or eleven years of formal education, and had past relevant work experience as a restaurant manager. Plaintiff had worked at Burger King for 35.5 years before being terminated on May 4, 2006 after the franchise was robbed, although plaintiff was never implicated in that crime. Since then, plaintiff was able to do some light housework but little more than that due to medication side-effects and hand numbness, particularly on the right. Plaintiff testified that the medication she took for her back pain left her "spaced out" and that one of her medications put her to sleep. Other medications included pressure and fluid pills and an antacid. (Tr. pp. 21-26).

Upon being tendered to her attorney for questioning, plaintiff testified to experiencing back pain that was exacerbated by moving the wrong way or sitting for prolonged periods of time. She also suffered from headaches that were sometimes so severe that she could not see and had to lie down. At times, the headaches lasted for weeks at time. Prior to the onset of her medical issues, plaintiff could walk two miles but could now walk only two blocks before having chest pains. Standing could be accomplished "[m]aybe a few hours at a time, but no more." When using stairs, plaintiff

would have to stop halfway up a flight to rest because of low back pain.  Lifting was limited to objects weighing five pounds with any heavier weight making her back go numb.  As a general rule, plaintiff would lie down an average of two hours per day. Plaintiff further testified that her job at Burger King sometimes required her to lift up to fifty pounds but that such work could no longer be performed due to standing demands and hand numbness. (Tr. pp. 25-28).

Nancy Favaloro, a VE, was next to take the stand.  She testified that although the exertional demands of plaintiff's past work were classified as light, that it was not uncommon for such restaurant managers to lift fifty pounds on the job which would elevate the work to a medium exertional level.  Thus, if plaintiff were limited to light and sedentary work she would be unable to perform her past relevant work as that work was actually performed. However, certain skills that plaintiff had acquired through the manager position, such as record and schedule-keeping and computer use, would be transferrable to other jobs.  The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age and education who was capable of performing work at the sedentary and light exertional levels.  In answer thereto, the VE identified numerous jobs that the person described in the hypothetical question could perform, such as information

clerk/receptionist, dispatcher, office clerk, administrative support worker, cafeteria worker, food service worker, and food preparer. (Tr. pp. 28-31).

After being tendered to plaintiff's attorney for further questioning, counsel added to the hypothetical question as initially framed by the ALJ frequent periods of disorientation due to medication side-effects. In answer to that question, the VE testified that such an individual would probably be unable to work. Counsel then modified the ALJ's initial hypothetical question to add a need to lie down one to two hours per eight-hour workday. In answer thereto, the VE testified that a one-hour rest period during lunchtime may be a possibility but was generally disallowed during normal working hours. Plaintiff then testified that she had indeed reported the medication side-effect of disorientation to her doctors. She also testified to suffering from bilateral CTS with pain still on the left side despite release surgery and persistent numbness on the right side, her dominant hand. In his closing remarks to the ALJ, counsel argued that the multiple side effects of plaintiff's medications provided support for the hypothetical questions counsel had propounded to the VE. (Tr. pp. 31-34).

The documentary evidence generated during the relevant time

period[1]/ begins with the results of a mammogram performed on May 8, 2006 that was normal. (Tr. p. 121). The following day, plaintiff was seen by a doctor from Cardiovascular Specialists, Inc. pursuant to a referral from Dr. Eduardo Persand, plaintiff's primary care physician. Presenting problems were chest tightness and shortness of breath associated with work with the episodes lasting two to three minutes for the previous two months. The doctor's report was positive for chest pain and shortness of breath but no diagnosis or treatment plan was given. (Tr. p. 186).

On May 10, 2006, plaintiff underwent carpal tunnel decompression surgery on the left at the hands of Dr. Harold Stokes following positive clinical and nerve conduction studies. (Tr. pp. 177-180). On May 18, 2006, Dr. Persand renewed plaintiff's prescription for potassium chloride. (Tr. p. 125). Approximately one month later, plaintiff participated in various cardiovascular studies at the suggestion of Dr. Roland Bourgeois. A gated S.P.E.C.T. myocardial perfusion study produced normal results. A

_____

[1]/ Social Security Regulations provide that where a claimant alleges that her disability began less than twelve months before her application for DIB was filed the Commissioner is to develop the medical history of the claimant beginning with the month that the claimant alleges that her disability began. 20 C.F.R. §404.1512(d), (d)(2). In the present case, plaintiff alleges that she became disabled on May 3, 2006 which is the day before she was terminated from her job as a manager at Burger King. The relevant evidence to be discussed here thus begins with that evidence that was generated in May of 2006.

myoview treadmill ECG test was also performed which produced sinus rhythm, poor R-wave progression, and subtle non-specific ST T-wave abnormalities during the resting EKG portion of the test; 82% of the age-predicted maximum heart rate; borderline systolic hypertension present at peak exercise and in the early recovery phase along with blunted chronotropic response; a normal one-minute recovery heart rate; chest pain and dizziness resolved by four minutes of recovery; a rare PAC but no complex atrial or ventricular arrhythmias; and, nondiagnostic ischemia readings due to resting baseline electrocardiographic abnormalities. (Tr. pp. 183-185).

When plaintiff was next seen by her cardiologist on June 29, 2006, she was still complaining of off-and-on chest pain and occasional shortness of breath. Medications included Detrol, potassium chloride, Indapamide, Clonidine, Bisoprolol, and Protonix. The assessment was continued chest pain with exercise, elevated cholesterol, and an abnormal ECG with exercise. Further testing was contemplated. (Tr. p. 182). Refills to plaintiff's Indapamide and Lotrel were authorized by Dr. Persand on July 24, 2006. (Rec. doc. 9-4, p. 5).

On August 2, 2006, plaintiff was consultatively evaluated by Dr. Miljana Mandich at the request of the state Disability Determination Services. Major complaints at the time were high

blood pressure and multiple aches and pains. In supplying Dr. Mandich her medical history, plaintiff reported being on high blood pressure medication since the age of sixteen with no problems or complications. She did complain of low back pain for several years which was aggravated from time to time by heavy lifting. An exacerbation had also occurred three years earlier following a car accident. Plaintiff additionally reported osteoarthritis in the knees, the left more than the right, with pain off-and-on but recently more frequent. She related her recent diagnosis of CTS with some occasional numbness in the fourth and fifth fingers of the left hand and occasional slight pain and numbness in the right wrist and hand which was "not bad yet". Plaintiff had experienced shortness of breath and sharp pains in the middle of the chest and under the left breast at a rate of two to three times per week for the previous three years, sometimes related to stress or rushing but sometimes with no precipitating event.

Dr. Mandich noted no abnormalities of the bones, joints, or muscles of plaintiff's extremities. Muscle bulk, tone, and strength were preserved in all four extremities. Sensation was intact and there were no abnormalities of coordination or involuntary movements. Deep tendon reflexes were also intact and there were no pathological reflexes or disturbances of gait. Chest x-rays taken at the time revealed no evidence of active pulmonary or cardiac

pathology. Similar studies of the left knee were normal and one of the lumbar spine revealed only a degenerative third lumbar disc. The diagnosis was: 1) hypertension, 2) status post carpal tunnel release on the left side with good results, 3) recurrent low back pain and pain in the knees but with no positive physical findings, 4) GERD by history, controlled with Protonix, and 5) atypical chest pain and shortness of breath at rest, not suggestive of angina and thought to be due to anxiety or GERD.  In summarizing the results of his evaluation, Dr. Mandich remarked that plaintiff's "... physical exam is completely unremarkable except for the blood pressure of 180/110". (Tr. pp. 195-202).

Plaintiff returned to Dr. Persand on August 14, 2006 complaining of heartburn after eating anything.  She expressed a desire to go back on Nexium and a GI consultation was to be obtained. (Rec. doc. 9-4, p. 5).  On August 17, 2006, an Administration disability examiner reviewed the medical records then extant and found that plaintiff could lift twenty pounds occasionally, ten pounds frequently; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could never climb a ladder/rope/scaffolds but could frequently perform the other enumerated postural maneuvers; had no manipulative, visual, or communicative limitations; and, who was to avoid concentrated exposure to extreme heat and cold,

airborne irritants, and workplace hazards such as machinery and heights. Essentially, the examiner concluded that plaintiff was capable of performing light-level work. (Tr. pp. 187-194). Dr. Persand authorized a refill on plaintiff's Lotrel on September 6, 2006 and a refill on her Clonidine on September 14, 2006. (Rec. doc. 9-4, p. 5). The doctor saw plaintiff again on November 16, 2006 at which time she complained of tingling in the right hand and dropping things with that extremity. Plaintiff was to see a hand surgeon. (Id.).

On November 22, 2006 plaintiff was evaluated at the Daughters of Charity Health Center in connection with complaints of headache, hypertension, and back and leg pain. She stated that her headache was of three days' duration and that she experienced continued pain and numbness in her hand despite carpal tunnel release surgery. Plaintiff's blood pressure was 122/78 on this date. The assessment was hypertension; GERD; back pain; hand numbness, pain, and tingling; and, migraine headaches. (Tr. pp. 237-240). The next medical records were not generated until March 1, 2007 when plaintiff underwent an MRI of the cervical spine that had been ordered by Dr. Jose Padin-Rosada. That test revealed mild left convex scoliosis with no fracture or subluxation but degenerative changes at virtually all disc levels. Those were most marked at C5-6 and C6-7 where there was prominence of the disc-hypertrophic

14

complex and central spurring impinging upon the anterior aspect of the dural sac causing mild stenosis at those levels. Otherwise, the examination was normal with the cervical spinal cord being normal in caliber and signal intensity. The overall impression was degenerative changes throughout the cervical spine with mild secondary cell stenosis at C5-6 and C6-7. The final diagnosis was cervicalgia. (Tr. pp. 241-242).

Plaintiff returned to the Daughters of Charity Medical Center on March 7, 2007. One of the records from that date indicates that plaintiff's chief complaint was stomach cramps and hallucinations due to medication. (Tr. p. 235). Another treatment record from that date documents plaintiff's complaint of discomfort during urination for the previous several weeks. The assessment included a diagnosis of hypertension. (Tr. p. 236). Plaintiff was seen one final time by Dr. Persand on March 11, 2007. Her blood pressure was measured at 140/70 and her weight was 199.5 pounds. Plaintiff complained of being tired and experiencing chest pain after walking two blocks, problems which had been ongoing for the previous two months. She also complained of heartburn when she failed to take Nexium. The diagnosis was hypercholesterolemia. (Rec. doc. 9-4, p. 6). As noted earlier, the hearing with the ALJ would subsequently go forward on April 18, 2007.

Plaintiff's first challenge to the Commissioner's decision is

that the ALJ erred in failing to find that her cervical and lumbar degenerative disc disease was a "severe" impairment. (Rec. doc. 9-3, pp. 6-8). Inasmuch as plaintiff's claim for Social Security benefits proceeded past step two of the §404.1520 sequential analysis and was not summarily denied at that step based on the fact that she did not suffer from a severe impairment, this challenge provides no basis for disturbing the Commissioner's decision. <u>Adams v. Bowen</u>, 833 F.2d 509, 512 (5th Cir. 1987); <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1011 (5th Cir. 1987).

In her second challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to apply the proper legal standard in determining her credibility, giving insufficient weight to her hearing testimony relative to her inability to stand for long periods of time due to back pain, medication side-effects, severe headaches, and a need to lie down during the day. (Rec. doc. 9-3, pp. 6, 9-14).

In addressing plaintiff's challenge, the Court first notes that the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991); <u>Griego v. Sullivan</u>, 940 F.2d 942, 945 (5th Cir. 1991); <u>Wren v. Sullivan</u>, 925 F.2d 123, 129 (5th Cir. 1991); <u>Moore v. Sullivan</u>, 919 F.2d 901, 905 (5th Cir. 1990). In addition,

16

the law is clear that the burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the plaintiff's testimony and subjective complaints against the objective medical evidence that has been produced. Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing Jones, 702 F.2d at 621 n.4). The evaluation of a plaintiff's subjective symptoms is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court. Harrell, 862 F.2d at 480. The ALJ may discredit a plaintiff's subjective complaints of pain and other limitations if he carefully weighs the objective medical evidence and articulates his reasons for doing so. Anderson v. Sullivan, 887 F.2d 630, 633 (5th Cir. 1989)(citing Abshire v. Bowen, 848 F.2d 638, 642 (5th Cir. 1988)).

In his written decision of May 22, 2007, the ALJ first found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 3, 2006. (Tr. p. 13). Proceeding to step two of the five-step analysis under §404.1520, the ALJ then found that plaintiff suffered from severe impairments in the form of CTS, hypertension, and arthritis. (Id.). However,

17

at step three, the ALJ concluded that the foregoing impairments, while severe, did not satisfy the criteria of any of those set forth in the Listing of Impairments. (Tr. p. 14).

Properly proceeding to steps four and five of the sequential analysis, the ALJ then made an assessment of plaintiff's residual functional capacity to perform work-related activities despite her impairments as required by 20 C.F.R. §404.1520(e). (Tr. pp. 14-15). In doing so, the ALJ noted, the credibility of plaintiff's subjective complaints must be weighed against the objective evidence of record based on the various factors enumerated in SSR 96-7p. (Id.). The ALJ observed that plaintiff had worked for over thirty-five years up to and including the date that she alleged she became disabled and that she had been terminated for reasons wholly unrelated to her ability to work. (Tr. pp. 13-14). See Villa, 895 F.2d at 1024.

As part of his evaluation process, the ALJ accurately summarized plaintiff's hearing testimony and weighed it against the relatively limited objective evidence that was generated during the relevant time period. (Tr. pp. 13-15). On May 9, 2006, plaintiff was seen at Cardiovascular Specialists for complaints of episodic chest tightness and shortness of breath but no diagnosis or treatment plan was indicated and plaintiff's activities were not limited in any way. Plaintiff underwent carpal tunnel release on

the left on May 10, 2006 with good results and, as respects the right hand, the ALJ observed that plaintiff had received little treatment or therapy with respect to that extremity. (Tr. p. 14). On June 27, 2006, plaintiff completed the Administration's Function Report and indicated that she could cook, perform various household chores, do laundry, drive a car, go to church, and visit with relatives. (Tr. pp. 80-89). Plaintiff's ability to perform such activities is not indicative of someone who is unable to perform any work whatsoever, Leggett v. Chater, 67 F.3d 558, 565 n. 12 (5th Cir. 1995), and reports such as the Function Report may properly be considered by the ALJ in determining a claimant's disability status. Vaughn v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995).

On June 29, 2006, plaintiff complained of off-and-on chest pain and occasional shortness of breath and was diagnosed with continued chest pain with exercise, elevated cholesterol, and an abnormal ECG with exercise. On August 2, 2006, plaintiff was subjected to a thorough evaluation by Dr. Mandich which produced wholly unremarkable results except for a blood pressure reading of 180/110. Plaintiff saw Dr. Persand for the very first time during the relevant time period on August 14, 2006. Heartburn was the presenting complaint and a GI consultation was to be obtained. Three days later, an Administration disability examiner reviewed plaintiff's file and found that she could perform light-level work.

Plaintiff did complain of tingling and grasping problems with the right hand when she was next seen by Dr. Persand on November 16, 2006. She also complained of chest pain, back and leg pain, and pain and numbness in the left hand when seen at the Daughters of Charity on November 22, 2006. However, the mere existence of pain or the fact that an individual is unable to work without experiencing pain is not an automatic ground for obtaining DIB. Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1985)(citing Jones, 702 F.2d at 621 n. 4). Degenerative changes to the cervical spine were revealed through an MRI that was performed on March 1, 2007. One of the Daughters of Charity's treatment records from March 7, 2007 does contain a reference to stomach cramps and hallucinations, possibly due to medication side-effects or a drug interaction, but there is no indication that it was anything other than a single, isolated episode. Plaintiff was seen for the third time by Dr. Persand on March 11, 2007 for heartburn and complaints of fatigue and chest pain after walking two blocks. The diagnosis was hypercholesterolemia and no restrictions were imposed on her activities.

Dr. Mandich, whose medical report is the most thorough of those that were admitted in the proceedings below, found no objective support for plaintiff's complaints of back pain or an inability to stand for long periods of time. Aside from the

single, fleeting reference to a possible medication side-effect or complication on March 7, 2007, the record offers no objective support for any medication-related limitations. On the contrary, in two separate Disability Reports that appear in the record, no side effects from plaintiff's various medications were identified, including any that may have been caused by Indapamide or potassium chloride. (Tr. pp. 76, 97). Absent some complaint, presumably to the prescribing physician, the Court is directed to no authority which obligates an ALJ to explore every possible, as opposed to actual, side effect that a claimant's medications may cause. A migraine headache and fatigue were each mentioned once on separate occasions but there is no indication that those episodes occurred with such frequency so as to significantly affect plaintiff's abilities. Simply put, subjective testimony and complaints do not take precedence over objective medical evidence. That was essentially the reason cited by the ALJ for giving plaintiff's testimony the weight that he did. (Tr. pp. 13-15). That fulfills his duty here. Godbolt v. Apfel, 1999 WL 179476 at *9 (E.D. La. 1999)(citing Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)). See also Augustine v. Barnhart, 2002 WL 927797 at *4 (E.D. La. 2002); Collins v. Callahan, 1998 WL 118082 at *3-4 (E.D. La. 1998).

Plaintiff's third challenge to the Commissioner's decision is that the ALJ erred in assessing her as retaining the residual

functional capacity to perform light to sedentary work. In support of this challenge, plaintiff points to longstanding diagnoses of hypertension, degenerative disc disease, CTS, GERD, and migraine headaches, together with the presence of obesity. (Rec. doc. 9-3, pp. 6-7, 14-16).

As aptly noted by the ALJ, plaintiff alleges that she became unable to work as of May 3, 2006 which was actually the day before she was terminated from her job as a restaurant manager. Her termination had nothing to do with her physical condition. Although the Court does not dispute that plaintiff has long been diagnosed as suffering from hypertension, degenerative disc disease, CTS, GERD, and possibly even migraine headaches, she was apparently able to work over the years despite those conditions. Johnson, 864 F.2d at 347-48. Obesity was never identified as a disabling condition in the Disability Report accompanying plaintiff's application for DIB. See Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir. 1989). Dr. Mandich, whose report is the most comprehensive of any of those that were generated in the relevant time period, found the results of plaintiff's examination to be completely unremarkable except for elevated blood pressure. Plaintiff's own treating physicians never declared her disabled or advised her to limit her activities in any way. The disability examiner who reviewed plaintiff's file found that she could perform

a range of light work. Based on the objectively-supported evidence that was before him, the ALJ's assessment of plaintiff's residual functional capacity was a proper one.

In her fourth and final challenge to the Commissioner's decision, plaintiff alleges that the hypothetical question posed to the VE by the ALJ was not supported by substantial evidence. Borrowing upon her second and third challenges herein, plaintiff argues that the ALJ's hypothetical question to the VE was flawed because it failed to include medication side-effects and numerous limitations that she testified to and included a residual functional capacity for light to sedentary work which she was simply incapable of. (Rec. doc. 9-3, pp. 7, 16-19).

A hypothetical question to a VE must reasonably incorporate all of the disabilities of a claimant which are recognized by the ALJ. Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994). Faced with the conflicting evidence before him, which included at one end of the spectrum plaintiff's testimony of severely restricted abilities, a need to lie down for two hours per day, and headaches sometimes lasting for weeks at a time, and at the other end of the spectrum the wholly unremarkable findings from Dr. Nitsche and those of plaintiff's own treating physicians which contained no restrictions, the ALJ arrived at a residual functional capacity for light to sedentary work. As discussed above, because the Court

believes that the ALJ properly assessed both plaintiff's subjective complaints and her residual functional capacity, he was under no obligation to include in his hypothetical question to the VE other limitations that lacked objective support. <u>Owens v. Heckler</u>, 770 F.2d 1276, 1282 (5th Cir. 1985). <u>See</u> <u>also</u> <u>Morris v. Bowen</u>, 864 F.2d 333, 336 (5th Cir. 1988). The VE's answer to the hypothetical question as framed by the ALJ constitutes substantial evidence that plaintiff was not disabled.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this <u>21st</u> day of <u>December</u>, 20<u>09</u>.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE